No. 591

First Circuit

—

CASSIDY ET AL. v. HOLLIMAN & SPIERS ET AL.

—

(March 5, 1930. Opinion and Decree.)
(April 14, 1930. Rehearing Refused.)
(July 2, 1930. Writ of Certiorari and Review Refused by Supreme Court.)

—

Bascom D. Talley, of Bogalusa, attorney for plaintiffs, appellees.

Ott & Rich, of Bogalusa, attorneys for C. B. Dunn and Colonial Creosoting Company, defendants, appellants.

ELLIOTT, J. John H. Cassidy and Daniel E. Sheridan, owners of the E½ of the W½ of section 20, headright 41, township 1 S, range 13 E, except 50 acres reserved by John Green on the north end, sold and delivered the pine timber on said land to C. H. Holliman and R. S. Spiers by written contract dated January 2, 1928. The price of the sale was $7 per M, to be paid as the timber was cut and removed. The contract provided that Holliman & Spiers were to deliver all the lumber manufactured from the timber on said land to the Colonial Creosoting Company, Inc., in Bogalusa, and the creosoting company was to hold out $7 per M for all the lumber shipped off the land and pay same to the

plaintiffs, except as provided for in a clause, which reads as follows:

"Should the parties of the second part, at a later date, desire to ship lumber to other parties other than the Colonial Creosoting Co., Inc., at Bogalusa, La., they shall have the right to do so with the understanding that all bills of lading and invoices are to be put through the City Bank & Trust Co., of Bogalusa, La., for collection. Said bank to make all collections and deduct $7.00 per M feet from each invoice to be paid to the party of the first part, the balance to go to the party of the second part."

The plaintiffs allege that C. B. Dunn and the Colonial Creosoting Company, Inc., were parties to the contract, in that they were present when it was prepared, written, and signed, and familiar with all of its clauses.

That Colonial Creosoting Company, Inc., acting through C. B. Dunn, its manager and buyer, took cognizance of the contract the day it was executed and wrote plaintiffs agreeing to hold out $7 per M feet for all lumber delivered, to make settlement every two weeks and to furnish statement when each payment was made for all lumber delivered.

That Holliman & Spiers went on the land and started cutting the timber, under contract, when C. B. Dunn and Colonial Creosoting Company, Inc., through its officers and agents, acting in conspiracy with said Holliman and without the knowledge or consent of petitioner, bought out the interest of Spiers in the contract; paying him $500 in cash therefor, advanced by the creosoting company.

That the Colonial Creosoting Company, Inc., through its officers and agents and the said Dunn and Holliman, then entered into a conspiracy to cut the timber in question and ship it out in a way differ-ent from that contemplated and agreed on in said contract, and did, in conspiracy with each other, cut said timber, manufactured it into lumber, and caused it to be shipped out and sold to various parties putting the invoices for same through the Washington Bank & Trust Company instead of the City Bank & Trust Company, as required by the contract, and did not pay petitioners the $7 per M stumpage as provided for in said contract, thereby defrauding them of the stumpage.

The plaintiffs further aver that the defendants were all engaged in the sawmill business, and as such, were commercial partners and liable in solido for the amount due them on said account.

The defendants Holliman & Spiers and C. H. Holliman and R. S. Spiers answered personally, admitting all the important facts alleged in the petition of the plaintiffs. Spiers admits that during the month of August, 1928, he sold out his interest in the contract to C. B. Dunn for $500, receiving check of Colonial Creosoting Company, Inc., in payment. He further avers in his answer that Dunn took over and assumed his interest in the contract following the sale, and that thereafter he had nothing to do with the manufacture and sale of said lumber.

C. B. Dunn and Colonial Creosoting Company, Inc., appeared and excepted to plaintiff's demand on the ground that it was vague and inconsistent and set forth no right or cause of action. They also moved that plaintiffs be required to elect whether they are attempting to hold defendants as partners in the firm of Holliman & Spiers, or as tort-feasors, by reason of the conspiracy in which they were alleged to have entered. The minutes of the lower court were not questioned in the lower court, and they do not show that the

court ruled on any of these motions or exceptions. Appellants argue them in their brief, but their arguments cannot be considered, because there are no rulings on the subject to review. The plaintiffs, however, amended their petition following same, and allege in the amendment that defendants are all liable in solido as partners, and, if not as partners, then as conspirators in a conspiracy entered into for the purpose of defrauding petitioners, and whereby they were damaged, injured, and defrauded in the way and to the extent stated. This amendment and alternative prayer for judgment was allowed without objection. Dunn and Colonial Creosoting Company, Inc., then answered separately. Colonial Creosoting Company, Inc., admits writing to plaintiffs as alleged in article 7 of their petition. Alleges that it did not know that Dunn had bought out the interest of Spiers in the contract with plaintiffs, and taken his place as a partner in the contract with Holliman. That it had been informed and believed that he had not done so, but that, if he did buy him out, it was done in his individual capacity and not as an agent or employee of this defendant. That it knew nothing about such a purchase and had nothing to do with it. That it does not know how much timber was cut by Holliman & Spiers from plaintiff's land. That it has paid plaintiffs for all lumber received by it from said land. The conspiracy alleged against it is denied.

Dunn, in his answer, denied that he had bought out the interest of Spiers in the contract with petitioners. His answer is in all other respects similar to that of Colonial Creosoting Company, Inc.

The court rendered judgment in favor of the plaintiffs and against all the defendants in solido for $1,975.

Colonial Creosoting Company, Inc., and C. B. Dunn appealed.

On June 2, 1928, the day the contract was signed, Colonial Creosoting Company, Inc., wrote plaintiffs as follows:

"Bogalusa, La., June 2nd, 1928.
"Mr. J. H. Cassidy,
"Mr. D. E. Sheridan,
"Gentlemen: I have read over the contract made this day between yourselves and Mr. C. H. Holliman and R. S. Spiers, in reference to the purchase of a certain lot of timber located on the following described property: (Description not copied) "According to the contract this lumber is to be shipped to the Colonial Creosoting Company and we are to hold out $7.00 per thousand feet for all lumber delivered to us.—This we agree to do and make settlement with you every two weeks. We will also furnish statement when each payment is made for all lumber that is delivered to us by the above named parties.
"Yours very truly,
"Colonial Creosoting Co.
"C. B. Dunn, buyer."

Mr. Dunn had signed the contract between Cassidy and Sheridan on one side, and Holliman & Spiers on the other, as a witness. He was therefore already familiar with all its provisions. In this letter he says that he had read over the contract. Dunn thereby bound Colonial Creosoting Company to hold out $7 per M of the lumber delivered to it under the contract and pay it to the plaintiffs every two weeks, and to furnish statement with each payment, showing all lumber delivered. Dunn's authority to do this is not questioned by Colonial Creosoting Company. In its answer the authoritative force of this letter is conceded. It did purchase and ship most of the lumber that had been manufactured from the timber cut from plaintiffs' land.

The averment in the answer of Colonial Creosoting Company, Inc., that it had been

informed and believed that Dunn did not buy out the interest of Spiers in the contract with the petitioners, but that, if he did, it was done in his individual capacity and not as an agent or employee of Colonial Creosoting Company, Inc., and that it knew nothing about the purchase and had nothing to do with it, seems to be completely disproved. The subject-matter, due to its environment and to the fact that Dunn was the manager and only local agent of Colonial Creosoting Company, Inc., was peculiarly within their knowledge and should have been cleared up by them. But the fact is evident that one of them did it and acted as a partner with Holliman. Both Holliman and Spiers testify that one or the other of them did it and became a silent partner with Holliman, Dunn requesting that it be not known that he had done so. It appears in various ways. Spiers testifies that it took place in August, 1928, and identified a check for $550 dated August 18, 1928, signed, "'Colonial Creosoting Co., Inc.," by C. B. Dunn, payable to Holliman & Spiers, the proceeds of which he received for his interest. Mr. Dunn sought to explain this check differently, but his explanation is unconvincing.

The evidence indicates that Spiers, after this date, took no further part in the cutting, manufacturing, and delivery of the lumber, but, pursuant to a conspiracy, allowed his name to be used as if no change had taken place. Checks were drawn after the sale payable to Holliman & Spiers, just as if Holliman & Spiers were carrying on the contract. The purpose of this was concealment, and it supports the statement of Holliman and Spiers that the fact was to be kept concealed. The evidence shows that about this time Dunn became a weekly visitor to the sawmill engaged in cutting the timber on plaintiffs' land. He was sometimes there oftener than once a week;

and, in the absence of Holliman, gave orders to the sawyer as to the lumber that was to be manufactured. He became to a large extent the manager of the business.

The fact is further supported by a written agreement entered into between Holliman and Colonial Creosoting Company, Inc., the latter acting through Mr. Dunn, of date October 13, 1928. From the terms of this contract one might suppose Mr. Holliman to be the sole proprietor of the sawmill engaged in cutting the timber on plaintiffs' land, and to have been the sole party contracting with them in the contract of June 2, 1928.

Mr. Holliman in terms borrows from Colonial Creosoting Co. $1,000 to pay operating expenses of the mill and to pay stumpage due Cassidy and Sheridan for timber purchased from them, and obligates himself to deliver to Colonial Creosoting Company all the lumber manufactured from said timber as security for the amount advanced him for said purposes. This contract is consistent with the purchase exposed by Holliman & Spiers, and inconsistent with any other situation.

We are satisfied that Spiers sold his interest in the contract with plaintiffs to either Dunn or Colonial Creosoting Company. Mr. Dunn appears as the sole officer of Colonial Creosoting Company in the management of its local business, and acted for it as he saw proper. There is some reference in his testimony about personal acts; but the evidence indicates that he acted throughout as manager of Colonial Creosoting Company.

The evidence shows that Holliman, Dunn, and Colonial Creosoting Company, Inc., all acting together, the latter through Dunn, shipped and sold 74,246 feet of lumber to a party in New Orleans, and 37,961 feet to

another in Jackson, Miss., and, while there is claim that some of the timber which went into these shipments did not come from plaintiffs' land, about 75,000 feet of it did, and the invoices for same were all put through Washington Bank & Trust Company, instead of the City Bank & Trust Company. They all knew that plaintiffs were entitled to $7 per M stumpage on same, but plaintiffs were not credited with any stumpage on these shipments amounting to upwards of one hundred thousand feet. Mr. Dunn, questioned about these shipments, could not deny it, but tried to explain that he had acted in the matter at the request of and for the benefit of Mr. Holliman, but the proceeds of the lumber was credited by Washington Bank & Trust Company entirely to Dunn. He drew it out of the bank and turned over $1,224.25 of it to Holliman, but kept the balance, an amount which the evidence indicates was as large. But whether the sum retained was for his own benefit or that of Colonial Creosoting Company, Inc., the evidence does not show.

The evidence further shows that several thousand feet of lumber manufactured from timber cut on plaintiffs' land was also sold to different parties in the neighborhood of the mill. Mr. Dunn knew it had been done, yet no credit was given plaintiffs for the stumpage.

The evidence shows that Dunn, Colonial Creosoting Company, and Holliman were taking timber from several tracts of land at the same time. The testimony of Mr. Dunn and of other witnesses as to how the amount of lumber delivered to Colonial Creosoting Company, Inc., that had been manufactured from timber cut on plaintiffs' land, was kept account of indicates that proper care to do so was not taken. Mr. Dunn says that the checker on Colonial Creosoting Company yard would ask the truck driver, who brought loads, whose land the lumber came from. That the checker would take the name and give credit to the proper party. Such a method made it easy to make, but difficult to rectify, a mistake and get the true amount.

Returning to the partnership between Holliman & Spiers, the evidence indicates with reasonable certainty that Spiers ceased to be a partner with Holliman on August 18, 1929, and after which time either Dunn or Colonial Creosoting Company, Inc., acting through him, one or both acted as partners with Holliman in operating the mill; but the fact was kept from being known to any, except those participating in the arrangement. But a partnership does not exist, except when created by an agreement. These parties may not have been partners in a legal sense, but the proper deduction and inference from all the evidence on the subject justifies the conclusion that Holliman, Spiers, Dunn, and Colonial Creosoting Company, Inc., were parties to a conspiracy whose object was to cut the timber from plaintiffs' land under the contract which had been entered into between plaintiffs and Holliman & Spiers on June 2, 1928, and dispose of the lumber and to not pay plaintiffs the $7 per M stumpage which the contract provided for.

"The evidence in proof of conspiracy will generally, from the nature of the case, be circumstantial. Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed in terms to have that design, and to pursue it by common means. If it be proved that the defendants pursued, by their acts, the same object, often by the same means, one performing one part and another, another part of the same, so as to complete it, with a view to the attainment of the

same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object." Greenleaf on Evidence (12th Ed.) vol. 3, sec. 93, p. 81.

And it is the same in proof of fraud:

"While fraud is never to be presumed, courts of justice recognize the cunning concealments in which it shrouds its devious practices and the difficulty of tracing it by direct proof. Hence they are warranted in giving due weight to all circumstances indicating its existence, and when such circumstances and the reasonable inferences, deductions and conclusions to be drawn from proven facts are of a character to force conviction on the mind, they are justified in finding fraud." Johnson vs. Mayer, 30 La. Ann. 1203; Grossman's Sons vs. Chachere, 136 La. 672, 67 So. 545.

Spiers was a party to the conspiracy to defraud, because he permitted the drawing of checks to Holliman & Spiers after he had sold and received payment for his interest, for the purpose of keeping the fact from the plaintiffs, to the end that Holliman and Dunn and Colonial Creosoting Company, Inc., might proceed under the contract as if no change had taken place, all the time being aware that the stumpage contract with plaintiffs was not being carried out.

It is contended in behalf of Colonial Creosoting Company, Inc., that a corporation cannot be made, by its agent, a party to a conspiracy for the purpose of injuring and defrauding another, but this is a mistake. The purchase of lumber was the business in which Colonial Creosoting Company, Inc., was engaged. And the rule is that a corporation can be made a party to a conspiracy by its agent and manager just as fully as if it had been a natural person, provided the agent, in doing the act, is in the exercise of the functions in which he is employed. Civil Code, arts.

2320 and 2324. Rabassa vs. Orleans Navigation Co., 5 La. 461, 25 Am. Dec. 200; Williams vs. Pullman Palace Car Co., 40 La. Ann. 87, 3 So. 631, 8 Am. St. Rep. 512; Bluefields S. S. Co. vs. Lala Ferreras Cangelosi S. S. Co., 133 La. 424, 63 So. 96.

From Ruling Case Law, vol. 7, subject Corporations, sec. 683, pp. 682 and 683, we quote as follows:

"At the present time it is universally recognized that ordinary private corporations may commit almost every kind of a tort and be held liable therefor, and this liability may be enforced in the same manner as if the wrong complained of had been committed by an individual."

Same section:

"Of course the individual by whom the tortious act is committed cannot, himself, escape liability on the ground that he was acting for the corporation. Such individual and the corporation are jointly liable and may be joined as defendants."

Then again, in section 687:

"A corporation may be held liable in an action of tort for fraud and deceit." And "in its relations to the public it is represented by its officers and agents, and their fraud in the corporate course of dealing is in law, the fraud of the corporation."

From Marshall on Private Corporations we take the following:

"On the contrary, it is well settled that a corporation may exceed the powers conferred upon it by its charter, and like a natural person, do wrong, and it may therefore be guilty of a tort. And the general rule is that a corporation is liable for the tortious acts and omissions of its officers and agents, to the same extent as a natural person would be under like circumstances." Chapter 7, sec. 104, p. 308.

Again:

"An act done by an officer or agent of a corporation as such, and in the course

of his employment, is in contemplation of law the act of the corporation, and the act is thus held to be the act of the corporation the intent with which it has been done may also be imputed to it.

"It is now well settled therefore, both in England and in this country, that fraud or deceit on the part of an officer or agent of a corporation in transactions which are within the scope of his authority, is imputable to the corporation, not only for the purpose of avoiding contracts and other transactions as against the corporation, but also for the purpose of an action of deceit against the corporation." Section 105, p. 310.

The lower court properly held Holliman, Spiers, Dunn, and Colonial Creosoting Company, Inc., all liable in solido. Kernan vs. Humble, 51 La. Ann. 389, 25 So. 431.

The 198,832 feet of timber turned in by Colonial Creosoting Company, Inc., as the total amount cut from plaintiffs' land, and on which it has paid stumpage, and, in addition, 2,183 linear feet of piling, cannot be accepted as correct under the facts of this case. The only way to arrive at the amount of loss sustained by the plaintiff is to take the estimate made of the timber on plaintiffs' land, the lowest of which was 600,000 feet, all of which was to be cut and manufactured into lumber and sold and stumpage deducted.

The contract contains the following clause:

"The parties of the first part are making a cash payment of $500.00 this day, the receipt of which is hereby acknowledged and it is understood that this $500.00 shall be held as a bonus or earnest money until the final completion of this contract, and it is also understood that the parties of the second part shall get credit for same on the last 100,000 feet of lumber they ship. In other words the basis of the contract is $7.00 per M for the total amount of pine lumber taken off of the above described lands."

With reference to the above stipulation,

the evidence shows that there remained, standing on the ground, logs cut and left in the woods, logs hauled to and left at the mill, lumber sawed from logs cut from plaintiffs' land and stacked at the mill, altogether in excess of 100,000 feet at the time defendants ceased operations under the contract.

Defendants were responsible for this timber and same will be charged against the $500 which was paid in cash at the time the contract was signed and the return of which was provided for, as above stated.

Defendant Colonial Creosoting Company, Inc., accounted to and paid the plaintiffs for less than 200,000 feet. There remains due the plaintiff under these figures a stumpage of 300,000 feet, and therefore justifies the amount which they were condemned to pay by the judgment appealed from.

The judgment appealed from is in our opinion correct. Judgment affirmed. All defendants to pay all the costs in the lower court. Appellants the cost of appeal.

LECHE, J., not participating.